GUSTAFSON ET AL., APPELLEES, *v.* COTCO ENTERPRISES, INC., APPELLANT.

(No. 73 C. A. 56—Decided September 25, 1974.)

*Mr. Joseph R. Bryan,* for appellees.
*Mr. Albert E. Brennan,* for appellant.

LYNCH, P. J. Defendant is appealing the following orders of the trial court (1) which enjoined it from constructing and operating a "drag strip" on its property in Berlin

Township because such operation constituted a nuisance and was an unreasonable interference with plaintiffs' use and enjoyment of their property and (2) which held that the plaintiffs are entitled to damages in the form of attorney fees and other expenses in prosecuting their suit.

On June 28, 1973, defendant acquired title to approximately 150 acres of land situated in Berlin Township with considerable frontage on the north side of U. S. Route 224, just to the east of Berlin Township Center. The deed was recorded on July 2, 1973. The purchase price was $85,000. Shortly after the purchase of the property, defendant made known its intention to construct and operate a drag strip.

Plaintiffs are the owners or occupiers of land situated in Berlin Township. Several of the plaintiffs live on property immediately adjacent to defendant's land and others live at various distances from defendant's land. The entire area adjacent to defendant's property is residential—agricultural. There are homes and farms, and a few small commercial establishments. Some of the farms are devoted to the raising of livestock as well as crops.

Approximately July 10, 1973, some of the plaintiffs met with officers of the defendant corporation and discussed the proposed drag strip operation. By letter dated July 12, 1973, plaintiffs notified defendant of their opposition to the construction of the proposed drag strip because they felt it would result in irreparable damage to their lives, to their property values and to their village, and that legal action would be taken if defendant would not reconsider its proposed use of its newly acquired property.

Defendant commenced clearing its land and a few days later on July 17, 1973, plaintiffs filed their complaint for injunctive relief. Berlin Township has not enacted any zoning laws or regulations.

Defendant's assignments of error are that the orders of the trial court are erroneous because:

1. They are contrary to law.

2. They are against the manifest weight of the evidence.

Plaintiffs agree that drag strip racing is not a nuisance per se. *Township of Bedminster* v. *Vargo Dragway, Inc.,* 434 Pa. 100, 253 A. 2d 659; *Jones* v. *Queen City Speed-*

*ways, Inc.*, 276 N. C. 231, 172 S. E. 2d 42; 66 Corpus Juris Secundum 784, 785, Nuisances, Section 31. See *Lykins* v. *Dayton Motorcycle Club*, 33 Ohio App. 2d 269. Plaintiffs further agree that the proposed drag strip is not unlawful because it does not violate any zoning ordinance in Berlin Township.

We agree with the holdings of several courts that the operation of a drag strip racing track in the vicinity of residential and agricultural properties may constitute such a nuisance in fact because of extraordinary noise during races that owners and occupants of residential property in the vicinity of such track are entitled to have such operation enjoined. *Sakler* v. *Huls*, 20 O. O. 2d 283; *Kohr* v. *Weber*, 402 Pa. 63, 166 A. 2d 871; *Township of Bedminster* v. *Vargo Dragway, Inc.*, 434 Pa. 100, 253 A. 2d 659; *Jones* v. *Queen City Speedways, supra;* 41 Ohio Jurisprudence 2d 127, Nuisances, Section 37.

We further agree with the following cases which have held that the construction of a proposed drag strip race track in a residential or rural neighborhood can be enjoined when the operation of such race track would create such an unreasonable amount of noise that serious interference would be caused to owners and occupants of surrounding property in their use and enjoyment of their property. *Shrew* v *Deremer*, 2 Ohio Misc. 65; *Hooks* v. *International Speedways, Inc.* 263 N. C. 686, 140 S. E. 2d 387; *Isley* v. *Little*, 217 Ga. 58, 124 S. E. 2d 80.

41 Ohio Jurisprudence 2d 143, 144, Nuisances, Section 55 states as follows:

"A court of equity may enjoin a threatened or anticipated nuisance, public or private, where it clearly appears that a nuisance will necessarily result from the contemplated act or thing which it is sought to enjoin. If the conceded facts show that the defendant contemplates the doing of things that will constitute a continuing public nuisance, injunction is the proper remedy. But the court must see plainly that the acts will constitute a nuisance before it will issue an injunction. The degree of proof required before a court will enjoin an anticipated nuisance must be convincing, and if the act or thing sought to be enjoined may or

may not become a nuisance, depending on the use or manner of its operation, or other circumstances, equity will not interfere. * * *''

The degree of proof required before a court will enjoin an anticipated or threatened nuisance must be clear and convincing. *Holzer* v. *Eppling*, 17 Ohio App. 414; 66 Corpus Juris Secundum 918, Nuisances, Section 127.

Defendant planned to build a quarter mile asphalt track running north from U. S. Route 224 roughly in the center of this property. The track would be approximately 1100 feet from their west property line at the entrance side of their property and 600 feet from their property lines on the top section. The track would be one of the biggest and most modern in this area. The track would operate on Sundays from April to October with time trials scheduled from 8 a. m. to 11 a. m. and races from noon to 6 p. m. An estimated 3,000 spectators would attend each racing day, but their spectator stands capacity would be for 5,000 people with parking space available for 10,000 automobiles. Plans were for a 12 foot high security fence constructed of three-quarter inch plywood to be erected all around the property, and for 50 poles for floodlights containing 3 to 5 light bulbs with 500 to 1500 wattage pointed downwards.

Defendant estimated that it would have about 280 time trials and races per Sunday. If the business was profitable, defendant would consider running races twice a week. Defendant's officers were hoping eventually to be able to handle a major event which would be a two day affair with 750 race cars and 50,000 people. The three officers and share holders of defendant testified that they had considerable experience with drag racing. Two have worked for the National Hot Rod Association.

Defendant wrote a letter of intent dated March 23, 1973, to the National Hot Rod Association in which it stated that it planned to build a new and modern Drag Strip according to the requirements and specifications of the National Hot Rod Association in order to obtain the approval of said association. The National Hot Rod Asso-

ciation does not allow jet engines on their sanctioned tracks because they are unsafe.

Defendant planned to curtail dust by use of blacktop or grass, to turn the lights downward at the race track to curtail reflection light beyond their property, to erect barrier fences for sound reduction, to control traffic by cooperating with the Mahoning County sheriff's office to set up a traffic pattern, and to prohibit the use of alcoholic beverages on the premises. The evidence was in conflict as to the effectiveness of barrier fences to reduce sound.

Defendant estimated that the following kinds of cars would be raced at their track: Stock or factory cars—70%; modified cars, dragster or rails—1 to 5%; funny cars— less than 1%. About 50% of the stock cars would be without mufflers and about 70% of all the cars that would race would be without mufflers.

Funny cars are specially designed and built for drag racing and cost a minimum of $25,000. Some of them use a mixture of nitro and other fuel. They develop between 1,500 and 1,800 horsepower.

Plaintiff's testimony was that part of the thrill of any drag race track was the noise and speed of the cars that would participate in the races. The racers start at a dead stop with their motors running at full speed and reach speeds of from 50 to 220 miles per hour by the time they travel the one-quarter mile length of the track. While two cars are racing each other, other cars are warming up their motors in preparation for racing. When the cars start racing, they peel rubber. Mufflers slow the exhaust and reduces the horsepower of a car so that they are removed to obtain the highest speed. Anything that tends to slow down a car is eliminated.

Funny cars and most of the rail cars do a burnout. The tires are coated with resin. Smoke is created that extends two to four hundred feet. There is nothing on the highway comparable to the noise of a funny car while in operation. A semi-truck or tractor trailer on the highway produces one-fourth to one-third of the noise of a funny car. The rail cars are also extremely loud.

Plaintiffs' expert sound engineer recorded sounds at Dragway 42, which is west of Salem, Ohio. The readings for stock cars racing averaged from 86 to 99 decibels at two separate points 500 feet from the starting line with the average background readings being 81 decibels and 88 decibels. The readings for funny cars at a distance of 1,000 feet from the starting line ranged from 100 to 104 decibels even though there were several trees and dense shrubbery between the recording device and the race track.

Defendant's sound expert also recorded sounds at Drag Strip 42 in West Salem, Ohio, and testified that at a distance of 3,500 feet from the starting line of the race track, he had average readings of 82 decibels with a maximum of 84 decibels. By comparison, at 36 feet from the south side of U. S. 224 in Berlin Center, immediately across the street from defendant's property, the average passing automobile was 75 decibels and the average passing truck was 90 decibels.

Several of plaintiffs' witnesses had either attended drag strip races or resided near drag strips. They testified that at the drag strips the racing of engines, the big blast, and rumbling noise and squealing of tires at the start of the race had no comparison either to the traffic noise on U. S. Route 224 or to the noise in a mill. The sound is comparable to a nearby rocket and artillery fire in the Korean War.

Witnesses residing from four-tenths to six-tenths of a mile from drag strip race tracks testified that the noise and vibrations eminating from such tracks is so loud and aggravating that normal conversations are not possible, television sets have to be turned up and windows facing the drag strip have to be closed. It shakes the windows of the house and interferes with social activities outside the house. Sleep is impeded or interrupted.

Plaintiff, John Hawkins, who is an experienced realtor living in Berlin Center, testified that approximately 100 people live in Berlin Center; that Berlin Center has developed into a quiet residential community, and that the proposed drag strip would "kill the market" for residential and agricultural properties immediately adjacent to

defendant's property by substantially reducing the values of such properties because of the noise and the character of some of the people who attend drag strip races. Two of the plaintiffs unsuccessfully tried to sell their properties when they learned of defendant's proposed drag strip.

The Methodist Church is located on the south side of U. S. 224 about 300 feet west of defendant's property and holds services from 9:45 a. m. until noon on Sundays and sometimes in the evenings; 300 members attended services the Sunday before the trial. One of the reasons for the opposition of plaintiff, John Hawkins, to this proposed drag strip was its proximity to the Methodist Church and defendant's proposed running of time trials during church services on Sunday.

In *Hooks* v. *International Speedways, Inc., supra*, the court held that a complaint alleging the prospective construction and operation of a race track for automobiles 2,500 feet from a rural church, where races would be held on Sundays, attracting thousands of people, causing much noise and improper conduct, and interfering with religious services, was sufficient to constitute a cause of action for permanent restraint.

Defendant introduced evidence indicating that it had incurred considerable expense in preparation for its proposed drag strip; however, we find that plaintiffs were diligent in notifying defendant of their opposition to this drag strip and in filing this lawsuit. We are not impressed with plaintiffs' contentions that this proposed drag strip will increase traffic and will disturb them because of fumes, dust, dirt and lighting.

However, we find that there is clear and convincing evidence to support the trial court's finding that the proposed drag strip race track would create such an unreasonable amount of noise that serious interference to plaintiffs, who are the owners and occupants of surrounding property, in their use and enjoyment of their property would be caused, so as to constitute a nuisance. Therefore, we affirm this part of the trial court's decision.

In 1970, the state of Illinois enacted the following legislative declaration:

"The General Assembly finds that excessive noise endangers physical and emotional health and well-being, interferes with legitimate business and recreational activities, increases construction costs, depresses property values, offends the senses, creates public nuisances. and in other respects reduces the quality of our environment." Ill. Anno. Stats. (Smith-Hurd) Ch. 111½, Sec. 1023, p. 229.

Pursuant to Ill. Anno. Stats. (Smith-Hurd) Ch. 111½, Sec. 1025, p. 230, the Illinois Pollution Control Board issued regulations which prohibited the emission of sound from any Class A or Class B land (1) during daytime hours that exceeded a maximum of 72 decibels (Regulation 202) and (2) during nighttime hours that exceeded a maximum of 63 decibels. If the Illinois law was applicable to the property at issue, these regulations would be applicable in this case.

However, we hold that the trial court committed error in awarding damages to plaintiffs in the form of attorney fees and expenses. As a general rule, the costs and expenses of litigation, other than the usual court costs, are not recoverable in actions for damages, and ordinarily no attorney fees are allowed. 16 Ohio Jurisprudence 2d (Rev.) 137, Damages, Section 116; 14 Ohio Jurisprudence 2d 28, 31, Costs, Section 33, 35.

Plaintiffs point out that attorney fees may be assessed where an intentional tort is committed. 16 Ohio Jurisprudence 2d (Rev.) 140, Damages, Section 118. However, we find that this case does not come under the type of cases where attorney fees may be assessed.

Judgment reversed as to the part which awards damages to plaintiffs in the form of attorney fees and other expenses in prosecuting this suit. Judgment affirmed as to enjoining defendant from constructing and operating its proposed "drag strip" on its property in Berlin Center.

*Judgment affirmed in part and reversed in part.*

O'NEILL and JOHNSON, JJ., concur.

JOHNSON, J., retired, assigned to active duty under authority of Section 6(C), Article IV, Constitution.