In re COMPREHENSIVE BUSINESS SYSTEMS, INC., Debtor.

CASHFLOW DESIGN, INC., Plaintiff,

v.

Townsend FOSTER, Jr., Trustee for Comprehensive Business Systems, Inc., Defendant.

DEPARTMENT OF JUSTICE, OFFICE OF the UNITED STATES TRUSTEE, United States of America, Plaintiff,

v.

CASHFLOW DESIGN, INC., Defendant.

COMPREHENSIVE BUSINESS SYSTEMS, INC., Plaintiff,

v.

CASHFLOW DESIGN, INC., Defendant.

Bankruptcy No. 3–88–03795.
Adv. Nos. 3–89–0017, 3–89–0018 and 3–89–0337.

United States Bankruptcy Court, S.D. Ohio, W.D.

Aug. 24, 1990.

Townsend Foster, Jr., Troy, Ohio, trustee.

Michael A. Baer, Troy, Ohio, for trustee.

Peter J. Donahue, Dayton, Ohio (Mark D. Shepard, Esq., of counsel), Pittsburgh, Pa., for Cashflow Design, Inc. and Buchanan Ingersoll Professional Corp.

Donald F. Harker, III, Dayton, Ohio, for John A. Moccabee and Susan Robinson.

Thomas B. Talbot, Jr., Dayton, Ohio, for Petitioning Creditors.

Alexander G. Barkan, Columbus, Ohio, U.S. Trustee Office.

## DECISION GRANTING JUDGMENT TO THE TRUSTEE IN BANKRUPTCY FOR COMPREHENSIVE BUSINESS SYSTEMS, INC.

WILLIAM A. CLARK, Bankruptcy Judge.

The following matters are before the Court: Cashflow Design, Inc.'s complaint to confirm validity, priority and extent of its security interest (Adversary Proceeding Number 3–89–0017); U.S. Trustee's Complaint for Preliminary Injunction (Adversary Proceeding Number 3–89–0018); Cashflow Design, Inc.'s Motion for Relief from Stay (Contested Matter (C) in Case No. 3–88–03795); and the complaint of the trustee in bankruptcy to enforce a settlement agreement (Adversary Proceeding Number 3–89–0337). The parties have agreed that the United States Bankruptcy Court has jurisdiction over all of the issues presented in the various adversary proceedings and the motion for relief from stay. The matters were consolidated for trial.

Cashflow Design, Inc. filed a memorandum of law on January 31, 1990, the day before the trial began on February 1, 1989. The trial lasted more than one and one-half days.

### STATEMENT OF FACTS

The parties entered into a Stipulation of Facts (Doc. 7) in Adversary Proceeding Number 3–89–0337 but reserved the right to object to any facts or documents stipulated to on the basis of relevancy and materiality. The stipulated facts are stated by the parties as follows:

AND NOW, come the parties, by and through their respective counsel, and pursuant to this Court's Order of December 7, 1989 stipulate to the accuracy of the following facts for purposes of the trial set to commence February 1, 1990. Each of the parties reserves the right, however, to object to the introduction of any of the facts or documents stipulated to herein on the basis of relevancy, materiality or any other evidentiary basis not otherwise stipulated to herein.

1. Townsend Foster, Jr. is the duly qualified and acting successor Interim Trustee of the estate of Comprehensive Business Systems, Inc. (hereinafter "Trustee").

2. Cashflow Design, Inc. ("Cashflow") is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal office and place of business at 1 Monroeville Center, Suite 1019, Monroeville, Pennsylvania.

3. The United States Bankruptcy Court for the Southern District of Ohio, Western Division, has jurisdiction over all of the issues presented in the various adversary proceedings and motions.

4. On or about November 29, 1988, Cashflow obtained a copy of the source code for the COBUS Software System, and has had said copy in its possession since acquisition.

5. The letter agreement dated July 19, 1988 between Cashflow and Debtor as set forth in the proof of claim filed by Cashflow is authentic and admissible.

6. The non-interest bearing Promissory Note dated August 19, 1988 in the face amount of $1,402,800 representing 167% of the $840,000 of cash loan advances from Cashflow to Debtor identified in Paragraph 11 herein is authentic and admissible.

7. The General Security Agreement dated August 19, 1988 granting Cashflow a second priority security interest in the assets of Debtor for the purpose of securing the Promissory Note described in Paragraph 6 is authentic and admissible.

8. The non-interest bearing Promissory Note dated August 19, 1988 in the face amount of $434,200 representing 167% of the first three cash loan advances identified in Paragraph 12 herein is authentic and admissible.

9. The General Security Agreement dated August 19, 1988 granting Cashflow a first priority security interest in the assets of debtor for the purpose of securing the Promissory Note described in Paragraph 7 and any future loans to Debtor is authentic and admissible.

10. The non-interest bearing Promissory Note dated September 1, 1988 in the face amount of $192,050 representing 167% of the $115,000 cash loan advance identified in Paragraph 12 herein is authentic and admissible.

11. Through and including May 31, 1988, Cashflow issued checks to Debtor totaling $840,000 as follows:

| 2488 | 5/30/86 | 30,000.00 |
| 2445 | 11/18/86 | 15,000.00 |
| 2482 | 12/12/86 | 45,000.00 |
| 122 | 4/30/87 | 50,000.00 |
| 165 | 6/03/87 | 25,000.00 |
| 191 | 6/30/87 | 50,000.00 |
| 2563 | 7/31/87 | 50,000.00 |
| 2583 | 9/01/87 | 50,000.00 |
| 2013 | 10/02/87 | 45,000.00 |
| 2653 | 12/02/87 | 65,000.00 |
| 2675 | 12/30/87 | 65,000.00 |
| 133 | 1/29/88 | 65,000.00 |
| 2723 | 2/26/88 | 65,000.00 |
| 2744 | 3/31/88 | 65,000.00 |
| 2746 | 4/10/88 | 25,000.00 |
| 2749 | 4/29/88 | 65,000.00 |
| 2081 | 5/31/88 | 65,000.00 |

12. Additional cash loans advances by Cashflow to Debtor were made as follows:

| | | | |
|---|---|---|---|
| | 7/1/88 | $ 85,000.00 | * |
| 2836 | 7/15/88 | 95,000.00 | |
| 2847 | 7/28/88 | 80,000.00 | |
| 2844 | 9/01/88 | 115,000.00 | |
| | TOTAL | 440,000.00 | |

* Subject to confirmation by cancelled check or other appropriate documentation.

13. The UCC Financing Statements filed by Cashflow with the Secretary of State, State of Ohio and the Recorder of Montgomery County, Ohio, as set forth in the Proof of Claim filed by Cashflow are authentic and admissible.

14. At the time of the filing of the above Financing Statements, all of the Debtor's assets were located in Montgomery County, Ohio.

15. At the time of the execution of the Security Agreements identified in Paragraphs 7 and 9, Debtor was insolvent as such term is used in 11 U.S.C. § 547(b)(3).

16. The transcript of the hearing of March 2, 1989, is authentic and admissible.

17. The "OUTLINE FOR SETTLEMENT DISCUSSIONS" dated March 1, 1989 is authentic.

18. The letter from Michael A. Snyder to Townsend Foster, Jr. under the date of January 23, 1989 is authentic; and on such date Michael A. Snyder was an attorney for Cashflow acting within that capacity.

19. Mark D. Shepard, Esq. was at all times material herein an attorney for Cashflow.

20. On March 2, 1989, this Court, with the consent of all parties, entered an Order in connection with Adversary Proceeding No. 3–89–0018 and Cashflow's Emergency Motion for Relief From Automatic Stay.

21. On March 7, 1989, Trustee mailed to all creditors and other parties in interest a notice of his intent to sell the COBUS Software System free and clear of all interests as set forth in the Trustee's notice filed herein March 10, 1989, together with the matrix attached thereto.

22. One objection to said notice was filed which, after notice and hearing, was dismissed by the Court. No other objections were filed.

23. By Orders dated April 5, 1989 and May 18, 1989, this Court authorized the Trustee to sell the COBUS Software System and adjoining rights to Cashflow, free and clear of encumbrances, claims and interest.

24. To date, John Moccabee, President and majority shareholder of Debtor, has not executed or entered into a non-competition agreement in favor of Cashflow or any other purchaser of the COBUS Software System.

25. On November 4, 1988, judgment by confession was entered against Debtor and in favor of Cashflow in the total amount of $2,231,955 in the Court of Common Pleas of Allegheny County, Pennsylvania at G.D. No. 88–19317.

26. The above judgment was transferred to the Court of Common Pleas of Montgomery County, Ohio as Certificate of Judgment No. 28027, dated November 10, 1988.

27. By Order dated January 9, 1989, this Court directed John Moccabee to produce and prepare for the benefit of the Trustee various information and documents relating to the COBUS Software System.

28. When Mr. Moccabee failed to comply with this Order, the Trustee, on April 6, 1989, filed a Motion for Order to Show Cause why Mr. Moccabee Should Not be Held in Contempt.

29. On April 27, 1989, prior to hearing on the above Motion, the Trustee withdrew his Motion.

30. The Security Agreement executed August 19, 1988, as identified in Paragraph

9, and the payment By Cashflow to Debtor on or about September 1, 1988 in the sum of $115,000.00 constituted a substantially contemporaneous exchange for new value as contemplated under 11 U.S.C. § 547(c)(1)(A) & (B), and therefore a valid lien in the amount of at least $115,000.00 exists, with no stipulation as to what items of property are covered by such lien or Security Agreement.

31. Paragraph C of the Interim Trustee's Complaint herein is hereby amended to state "$67,500" instead of "$65,500".

During the trial additional evidence was presented from which the court finds the following facts:

Cashflow Design, Inc. ("Cashflow") obtained the COBUS Software System Source code with the permission of the Interim Trustee, Milton L. Sprowl, for the purpose of enabling the Trustee to evaluate the COBUS Software System for purposes of sale. Without the aid of Cashflow, the Trustee testified he had no idea how he could evaluate this asset of the estate.

The court finds that Cashflow, through its principal, Donald R. Fralic, advanced substantial sums of money as loans to Comprehensive Business Systems, Inc. ("CBS") and its principal, Don Moccabee, from May 30, 1986 until September 1, 1988. These funds were furnished for the development of a software system in the computer software technology area known as computer aided software engineering (CASE), a complex, highly technical computer development area. Upon becoming disenchanted with the progress of the work on the new system called COBUS, Cashflow obtained a judgment against Comprehensive for $2,231,955.00 on November 4, 1988. This involuntary bankruptcy was filed the day Cashflow attempted to levy execution on its judgment. Cashflow vigorously pursued its collateral and, working with the Trustee, obtained access to the computer aided systems engineering software product in late November, 1989 with the consent of the Trustee.

A Cashflow computer expert worked diligently to obtain the source code from the computers at CBS's offices without making much progress. The U.S. Trustee registered concern that the secured creditor was receiving preferential treatment from the interim trustee. In January 1989 the interim trustee was replaced by a successor interim trustee, Townsend Foster, Jr. Acting independently the successor trustee impeded Cashflow's efforts to learn more about the COBUS software system.

The Trustee and Cashflow struggled at cross-purposes for two months until March 1, 1989, when they began negotiating the settlement of their several adversary actions and contested relief from stay motion.

After several hours of negotiation on March 1, 1989 the Trustee and Cashflow reached agreement on certain elements of an agreement. Cashflow agreed to pay the Trustee $67,500.00 for the COBUS software system and to release all of its claims in CBS's bankruptcy. Cashflow contends that additional elements are essential to the agreement which were: (1) that John Moccabee comply with a January 5, 1989 court order (Doc. 48) requiring him to produce certain information concerning the design function of the COBUS product; (2) that John Moccabee produce for the benefit of Cashflow tapes that compile the source code in its correct and organized fashion for the benefit of Cashflow; and (3) that John Moccabee enter into a noncompetition agreement with Cashflow so that the trade secrets and other confidential information learned during his employment by CBS are not used to compete against Cashflow respecting the COBUS product. Townsend Foster, Jr., the successor trustee, contends that he could not control or force John Moccabee to enter into a noncompetition agreement, but the trustee offered his services in attempting to obtain the cooperation of Mr. Moccabee. The trustee stated he could not guarantee Mr. Moccabee's cooperation. As an aid to obtaining the information, the trustee encouraged ex-employees of CBS to cooperate in all ways to obtain the COBUS internal design information for which the ex-employees were to be compensated by Cashflow. Cashflow took advantage of this opportunity and paid the ex-employees for their work over approxi-

mately six weeks to develop the internal design information of the COBUS product.

The negotiations for the settlement occurred in the late evening of March 1, 1989 and the morning of March 2, 1989 at a conference before a scheduled court hearing. The agreement was outlined for the record by the Trustee and Mark D. Shepard, Attorney for Cashflow, at the court hearing.

After filing a motion to compel Mr. Moccabee to comply with the previous court order, the trustee obtained his cooperation and received a ten page explanation of the source code from Mr. Moccabee. Townsend Foster, Jr., trustee, forwarded the ten page description concerning the COBUS product to Cashflow in early April, 1989. In April the trustee sent notice of the proposed sale with its terms to all creditors for approval. He received only one objection which was later withdrawn.

During March and April, 1989 Cashflow worked with ex-employees to develop the internal design information for the COBUS product and obtained from the ex-employees two notebook binders of that information. There was no contact between the Trustee and Cashflow until early June 1989, when Cashflow advised the Trustee it would not go forward with the purchase because the conditions of the sale had not been met. Cashflow contended that John Moccabee's written documentation was worthless and it had not received the non-competition agreement from John Moccabee.

Cashflow sent a noncompetition agreement to the Trustee in March 1989. The Trustee forwarded it to John Moccabee's attorney where it remained unsigned. John Moccabee refused to sign the noncompetition agreement.

## CONCLUSIONS OF LAW

### I. NATURE OF THE SETTLEMENT AGREEMENT

 Cashflow contends that any agreement between it and the trustee in bankruptcy is not enforceable because there was only a "tentative" settlement

agreement reached by the parties. A settlement agreement is a contract and where there is a dispute as to the existence of a settlement agreement, general contract principles govern. *Echols v. Nimmo*, 586 F.Supp. 467, 469 (D.W.D.Mich.1984). Obviously the settlement agreement was not "final" in the sense that all of the terms of the agreement had been performed; nor had the settlement reached the stage where it could have been approved by the court (after notice to the creditors of the proposed sale). But characterization of the settlement as "tentative" does not affect the nature of the contractual undertakings underlying the settlement agreement of the trustee in bankruptcy and Cashflow. Performance of the underlying agreements would have enabled the parties to have achieved a "final" settlement. As such, describing the settlement agreement as "tentative" is akin to describing a contract as executory and does not relieve either party of obligations under an otherwise binding settlement agreement.

Regardless of whether the settlement agreement is characterized as "tentative," it is clear that a contract was formed between the trustee and Cashflow for the purpose of settling various lawsuits. However, the precise terms and conditions of the settlement agreement are not so clear.

### II. THE PARTIES' CONTRACT AND CONDITIONS PRECEDENT

On March 2, 1989 the parties appeared before this court to put on record the terms of their settlement agreement. At that time the trustee in bankruptcy stated:

"There's been a conference between the court and all of the attorneys for all of the varying parties in which we informed the court that we have arrived at a settlement" (Tr. 2).

The settlement agreement outlined by the trustee in bankruptcy was as follows:

1) Cashflow agreed to purchase from the estate the COBUS product along with all its copyrights, names and connecting documents;

2) Cashflow was to pay to the trustee $67,500 in cash and to withdraw any proof of claim from the estate;

3) Cashflow would waive all rights under any security agreement to all materials or office equipment that was part of the bankruptcy estate;

4) the trustee in bankruptcy would send a notice of the proposed sale to the creditors, affording them an opportunity to object to the sale.

The trustee in bankruptcy also set forth other basic elements of the settlement which were contained in an agreed order subsequently signed by the court and entered of record on March 2, 1989. It essentially provided that:

1) Cashflow and others were enjoined from attempting to market or sell the COBUS product so long as the order was in effect;

2) Cashflow was enjoined from making representations on behalf of the trustee in bankruptcy;

3) Cashflow was authorized to seek the assistance of the ex-employees of CBS to obtain information about the COBUS product;

4) any information gained by Cashflow as a result of analyzing the COBUS product was deemed "confidential";

5) any person retained by Cashflow to review the COBUS product was required to execute a nondisclosure statement;

6) proceedings regarding a preliminary injunction and relief from stay were continued and the U.S. Trustee's motion for sanctions was withdrawn;

7) if someone other than Cashflow purchased the COBUS product all relevant documents and information would be turned over to the trustee and Cashflow

would enter into appropriate noncompetition and confidentiality agreements;

8) upon court approval of the sale to Cashflow, the provisions of the court's order contained in paragraphs 1 through 5 would expire.

The problems in interpreting the agreement between Cashflow and the trustee in bankruptcy begin with the statements made at the settlement hearing by Cashflow's counsel, Mark Shepard, who "just wanted to make sure that other aspects of [the tentative settlement] were mentioned to the court and put on the record" (Tr. 7). According to Mr. Shepard there were "three other very important aspects from Cashflow's perspective" (*Id.*):

1) "That John Moccabee will comply with this court's previous order requiring him to produce certain documentation and information concerning the design function of the COBUS product...." [1]

2) "That Mr. Moccabee will produce for the benefit of Cashflow tapes that compile the source code in its correct and organized fashion for the benefit of Cashflow from the personal computers that are present in the debtor's former offices."

3) "Third and probably most important, that Mr. Moccabee enter into a noncompete agreement so that the trade secrets and other confidential information that have been obtained during the time he was employed by Comprehensive Business Systems, the debtor, are not then utilized to compete with Cashflow in its efforts to market this product" (Tr. 7–8).

Cashflow contends that these comments or expressions of concerns by its attorney demonstrate the existence of conditions precedent to its obligation to purchase the COBUS product, and that it is relieved from any obligation under its settlement

---

1. On January 5, 1989 the court entered an order requiring John Moccabee to produce for the trustee in bankruptcy in written form within ten days of the entry of the order the following information:

1) an identification of the location of the written design theory of the COBUS software product in existing documentation;

2) an identification of the location of the COBUS functional detailed specification and description in existing documentation;

3) a description of the organization of the COBUS source code; and

4) a system flow diagram of the COBUS software in greater detail than is contained in existing documentation.

agreement with the trustee because the conditions have *never* been fulfilled.

A condition precedent is an act or event, other than a lapse of time, which must exist or occur before a duty of immediate performance of a promise arises. J. Calamari, *Contracts* § 138 (1970).

As a rule of thumb, provisions which commence with words such as "if," "on condition that," and "provided," create conditions to performance. Each case, however, involves the process of interpretation. *Id.* § 142.

In discerning the intent of the parties, it must be remembered that "[c]onditions precedent are not favored and the courts will not construe stipulations as conditions unless required to do so by plain, unambiguous language." *Sulmeyer v. U.S.* (*In re Bubble Up Delaware, Inc.*), 684 F.2d 1259, 1264 (9th Cir.1982).

■ Given the lack of specific reference to Cashflow's "concerns" as conditions precedent, the trustee's expressed assertion that he was "not selling Mr. Moccabee" (Tr. 11), the lack of reference to conditions in the parties' agreed order submitted to the court, the conflicting testimony at the hearing on this matter, the lack of any reference to any conditions precedent in the notice of trustee's sale, and the reservations expressed in the courtroom by the court concerning the feasibility of obtaining a noncompetition agreement from Mr. Moccabee, it is not possible for this court to find a clear and unambiguous indication that the *parties agreed* that the three items referred to by Cashflow's counsel at the March 2nd hearing were conditions precedent. The court therefore finds that, in the aggregate, there is insufficient evidence to clearly establish the existence of conditions precedent to the obligation of Cashflow to perform the settlement agreement.

In any event, because of subsequent conduct by Cashflow, the court's decision is not dependent upon a determination of whether the concerns articulated by Cashflow's counsel rise to the level of conditions precedent. The remainder of this section will assume, for the sake of discussion, that conditions precedent did exist in the settlement agreement between the trustee in bankruptcy and Cashflow.[2]

■ At the hearing Cashflow took the position that it is irrelevant whether it was the trustee's obligation to fulfill any conditions precedent or the obligation of Cashflow because the fact that the conditions were not fulfilled, in and of itself, excuses Cashflow from performing under the settlement agreement. Case law does not support Cashflow's position. In July of 1989, Cashflow notified the trustee in bankruptcy that it would not purchase the CO-BUS product; this act by Cashflow constituted a repudiation of the settlement agreement. As a result, the performance of any conditions precedent required to be performed by the trustee in bankruptcy was excused and the trustee may maintain an action without performing the conditions:

A party is excused from tendering performance of conditions when the other party repudiates the contract. *Hidalgo Prop., Inc. v. Wachovia Mortg. Co.*, 617 F.2d 196, 199 (10th Cir.1980).

Once it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts, such as conditions precedent. *Allbrand Discount Liquors, Inc. v. Times Square Stores Corp.*, [60 A.D.2d 568] 399 N.Y.S.2d [700] 701 (N.Y.App.Div.1977).

---

**2.** It is clear that any condition precedent with respect to a noncompetition agreement was not satisfied. However, any conditions precedent that were contained in the court's order of January 5, 1989 appear to have been functionally fulfilled. Although the responses of Mr. Moccabee may not have satisfactorily complied with *the order, it appeared from the testimony that* Cashflow was subsequently able to obtain the required information from the ex-employees of CBS. Most importantly, Cashflow never notified the trustee in bankruptcy that it was dissatisfied with the material furnished by Mr. Moccabee nor did it file anything with the court expressing its dissatisfaction. Instead, it unilaterally declared that conditions precedent had not been fulfilled and refused to perform.

See also *Brandtjen and Kluge, Inc. v. Biggs,* 205 Or. 473, 495 [288 P.2d 1025] (Or.1955); *Holt v. United Security Life Ins. Co.,* 76 N.J.L. 585, 590 [72 A. 301] (N.J.1908).

Alternatively, if any of the conditions precedent were to be achieved by Cashflow, Cashflow may not now assert the failure of those conditions as a defense to the trustee's action:

> The rule is clear and well settled, and founded in absolute justice, that a party to a contract cannot prevent performance by another and derive any benefit, or escape any liability, from his own failure to perform a necessary condition. *Talbott v. Nibert,* 167 Kan. 138, 146 [206 P.2d 131] (Kan.1949)

> It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure. *Shear v. National Rifle Assoc. of America,* 606 F.2d 1251, 1255 (D.C.Cir.1979) (quoting 5 *Williston on Contracts* § 677 at 244 (W. Jaeger, ed., 3d ed. 1961)).

See also *United Corp. v. Reed, Wible and Brown, Inc.,* 626 F.Supp. 1255, 1258 (D.V.I. 1986); *Knowles v. Henderson,* 156 Fla. 31, 35, 22 So.2d 384 (Fla.1945).

At the hearing in this matter, Cashflow's counsel stated that it was the duty and obligation of the trustee in bankruptcy to obtain a noncompetition agreement. The evidence does not support this statement. The trustee in bankruptcy testified that his position throughout the negotiations with Cashflow was that he would not oppose Cashflow's attempts to secure a noncompetition agreement from Mr. Moccabee, but that he did not believe he had the power to force Mr. Moccabee to sign such an agreement. Mr. Fralic initially testified that the trustee was to obtain a noncompetition agreement but later stated that he was not sure who was supposed to secure it. Dr.

Michael Shamos, a witness for Cashflow, testified that it was understood that it might not be possible for the trustee to obtain a noncompetition agreement and that the idea was to rely on the court. At the hearing on March 2, 1989, the following exchange took place between the court and Cashflow's counsel:

> Court: Then are you going to be in touch with [Mr. Moccabee] concerning this non-compete—

> Mr. Shepard: Well to the extent, there are two ways that can be handled; obviously that he voluntarily enters into a noncompete then there isn't a problem. To the extent that that doesn't occur, this court, and we would provide the court with authority for this proposition, has the authority to impose that obligation upon him to protect the ultimate purchaser of the product which if this is consummated—

> Court: But if he doesn't agree that may require another hearing to obtain that type of order. We understand that.

> Mr. Shepard: That's correct. But I just wanted the Court to understand that that's a very important aspect of this potential resolution. Thank you.

There is no reference to the trustee in bankruptcy having any duty to secure the noncompetition agreement. In the event that Mr Moccabee refused to voluntarily sign the noncompetition document, it was the court's understanding that Cashflow would attempt to secure a noncompetition "agreement" by applying to the court. Mr. Moccabee did not voluntarily sign a noncompetition agreement and Cashflow never applied to this court for an order compelling Mr. Moccabee to execute such an agreement nor did it ever request the trustee in bankruptcy to seek court assistance. Cashflow may not now assert that its voluntary failure to seek court assistance excuses its performance under the settlement agreement. Its own actions rendered the possibility of securing such an agreement impossible.[3]

**3.** There is no certainty that this court would have issued an order requiring Mr. Moccabee to enter into a noncompetition agreement. Although Cashflow assumed and assured the court that a noncompetition agreement could be wrenched from Mr. Moccabee by the court, the evidence is clear that neither the trustee in bankruptcy nor the court offered any assurance

### III. ALLEGED MISREPRESENTATIONS BY TRUSTEE IN BANKRUPTCY

Cashflow contends that it believed the trustee's statement that his expert witness, Odell Richardson, would testify at the relief from stay hearing on March 2nd that the COBUS product was worth from $500,000 to $1.4 million and, in reliance on such statement, decided that it should enter into the tentative settlement agreement "because this court would likely deny Cashflow's Motion for Relief from Automatic Stay on the basis of such testimony" (Post–Trial Brief of Cashflow at 17). However, "Cashflow is not claiming that its officers and representatives believed the trustee's statements that the COBUS software system was worth in excess of $1 million dollars" (*Id.*). At the outset and as a general observation, the court must note that—given the impressive array of expertise available to Cashflow both before and during the settlement negotiations—it is inconceivable that Cashflow could have *reasonably* relied on any alleged misrepresentations made during the course of settlement negotiations.

At the hearing Odell Richardson testified that he informed the trustee that he believed that the value of the COBUS product had a value of between $300,000 and $1.5 million. Ron Morris's recollection of a conversation with Odell Richardson in September, 1989, six months after the proposed settlement, did not contradict the Richardson testimony as to his opinion and probable testimony the previous March. The credible evidence before the court suggests that Mr. Richardson would have testified at the relief from stay hearing that the range of value above was indeed his opinion of the value of the COBUS product in March 1989. Therefore, the court finds no misrepresentation was made by the trustee. Further, Cashflow was hardly defenseless against the testimony of Odell Richardson because it had available the testimony of the eminent and impressive Dr. Shamos that the COBUS product had a maximum value of $100,000. Whatever the reasons that Cashflow agreed to settle the litigation,[4] the court simply does not believe that it settled in reliance upon a representation by the trustee of the potential testimony from Mr. Richardson.

### IV. SPECIFIC PERFORMANCE

Cashflow maintains that the trustee in bankruptcy is not entitled to specific performance on the ground that the trustee has not demonstrated any damage to the estate and that "the lack of *damage* resulting from a breach does not equate to lack of any adequate *remedy* at law" (Post–Trial Brief of Cashflow at 20). At the hearing, Dr. Shamos, Cashflow's expert witness, testified that as of the end of February 1989 he had formed the opinion that a third party might be willing to "take a flyer" on the COBUS software for up to $100,000 and to spend additional hundreds of thousands of dollars to bring the system into operational condition. He also testified, as did others, that the system has no

---

that Mr. Moccabee could be forced to sign a noncompetition agreement. (Nor has Cashflow ever supplied the court with any authority for its position.) Therefore, it is Cashflow that assumed the risk that such an agreement might not be obtainable; under such circumstances the court does not believe the failure to obtain an order from this court would have relieved Cashflow from its obligations under the settlement agreement. The point is irrelevant, of course, because Cashflow elected not to file for such an order and instead attempted to use the failure of conditions precedent as a method to back out of the settlement agreement.

4. Dr. Shamos testified that during the settlement negotiations the trustee in bankruptcy gave an eloquent and "probably accurate speech" in which he described the near impossibility of Cashflow being successful in its motion for relief from stay based on the general nature of the bankruptcy and his previous experience with this court. According to Dr. Shamos Cashflow agreed that the trustee's assessment was probably correct and that an agreement should be reached. In Dr. Shamos' view the predicate for the entire settlement was that the secured creditor, Cashflow, recognized that the time for attempting to salvage the COBUS product was running out and it was necessary to resolve the litigation so that Cashflow could preserve any value of the COBUS product. The important point is that there were significant reasons for settling besides any representation concerning the prospective testimony of Odell Richardson.

value today. Therefore, the court does not agree with Cashflow's contention that the bankruptcy estate has suffered no damages.

In addition, regardless of whether damages have been suffered by the bankruptcy estate, the circuit court of appeals for this court "has long recognized the broad, inherent authority and equitable power of a [trial] court to enforce an agreement in settlement of litigation pending before it, even where that agreement has not been reduced to writing." *Bostick Foundry Co. v. Lindberg*, 797 F.2d 280, 282–283 (6th Cir.1986). "Public policy strongly favors settlement of disputes without litigation.... Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit." *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir.1976). In short, settlement agreements will generally be enforced. *Odomes v. Nucare, Inc.*, 653 F.2d 246, 252 (6th Cir.1981).

In the instant matter, focusing on the promise to purchase the COBUS product and on the amount of any damage that has resulted from the repudiation of that promise by Cashflow is to ignore the fact that the promise to pay $67,500 arose out of the entire settlement agreement of the parties and not just from the agreement to purchase the COBUS product. To view the failure of Cashflow to comply with the terms of the settlement agreement as a mere contractual dispute is to close one's eyes to the reason the agreement was formed. *Aro Corp., supra*, 531 F.2d at 1371.

The agreement in question came into existence not in the free marketplace but in response to pending litigation in a federal court. It is not understating the issue to say that without the lawsuit, the agreement might never have come to pass. Therefore, the contract entered into between the parties cannot be viewed independently of the original suit; its formation was an outgrowth of this case. *Id.*

Here, several matters before the court were jointly compromised and resolved as a result of the settlement agreement, and the $67,500 was to be paid by Cashflow not just for the COBUS product but to settle all litigation it was involved in before this court. Mr. Fralic specifically stated that Cashflow "made no offer to purchase; we made an offer to settle." Mr. Fralic further testified that Cashflow was faced with additional expense and finding itself in a "stop-loss" situation agreed to settle, and that payment of the $67,500 was just a part of the deal.

Therefore, determination of the specific amount of damages suffered by the bankruptcy estate as a result of the total erosion of the COBUS product's value is unnecessary, and specific enforcement of the settlement agreement is equitable and appropriate.

## V. CLAIM FOR CONVERSION AND MOTION FOR DIRECTED VERDICT

At the conclusion of the trustee's case, the court reserved a ruling on the motion of Cashflow for a directed verdict. The motion asserted that there was a lack of evidence concerning Cashflow's alleged conversion of the COBUS product (particularly with regard to intent), that damages had not been established, and that as a matter of law a condition precedent of Mr. Moccabee signing a noncompetition agreement had not occurred.

As discussed, *supra*, the court has found that the execution of a noncompete agreement by Mr. Moccabee was not a condition precedent of the settlement agreement, and, if it was a condition precedent, it was excused by Cashflow's failure to obtain it. With respect to the issue of damages, the court has not made a specific finding of the amount of any damages because it is specifically enforcing the settlement agreement.

Finally, the court finds it unnecessary to determine whether Cashflow converted the COBUS product. The court is ordering Cashflow to comply with its obligation to purchase the product and no authority has been submitted by the trustee in bankruptcy to support assessing damages against a

party that is purchasing property it may have previously converted. The settlement agreement of March 2, 1989 was intended to settle all claims between the parties, including, presumably, any claim by the trustee for conversion. Because the settlement agreement is being specifically enforced, any claims of a party pre-dating the settlement agreement did not independently survive.

For these reasons Cashflow's motion for a directed verdict is denied.

## VI. ATTORNEYS' FEES

Although the trustee in bankruptcy acknowledges that attorneys' fees are not normally recoverable in breach of contract actions (*See, e.g., Gustafson v. Cotco Enterprises, Inc.,* 42 Ohio App.2d 45, 328 N.E.2d 409 (1974)), he asserts that equitable considerations support an award of attorneys' fees in the present case. The court disagrees. Initially, the court observes that the trustee has not supplied the court with any case law supporting his position. Secondly, the court does not find that the actions of Cashflow warrant the imposition of punitive damages, which would be the effect of awarding attorneys' fees in this matter. Although the court believes that Cashflow incorrectly concluded that the existence of conditions precedent and the nonfulfillment of such conditions relieved it from performance under the settlement agreement, the court does not find that Cashflow's actions were totally unjustified. As should be readily apparent from the discussion above, the existence and effect of conditions precedent in this case were highly uncertain.

The effect of this decision makes Cashflow's motion of relief from stay moot. By the terms of the agreement all rights to the Cobus product are to be transferred to Cashflow. The motion for relief from stay is denied.

Judgment will be entered in accordance with the court's decision forthwith.

## JUDGMENT FOR TRUSTEE

In accordance with the Decision filed simultaneously with this Order, judgment is granted to the Trustee against Cashflow Design, Inc. for the sum of Sixty–Seven Thousand, Five Hundred and 00/100 ($67,-500.00) Dollars, plus interest at the legal rate and costs.

IT IS SO ORDERED.